Filed 4/15/13  In re Myla F. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

|  |  |
|---|---|
| In re MYLA F., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.P., <br><br> Defendant and Appellant. | F065551 <br><br> (Super. Ct. No. 11CEJ300156) <br><br><br> **OPINION** |

<u>**THE COURT**</u>*

APPEAL from an order of the Superior Court of Fresno County.  Brian Arax, Judge.

Caitlin U. Christian, under appointment by the Court of Appeal, for Defendant and Appellant.

---

* Before Levy, Acting P.J., Cornell, J. and Gomes, J.

Kevin Briggs, County Counsel, and William G. Smith, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

K.P. (father) appeals from an order made at the six-month review hearing denying his request for placement of his daughter, Myla F. Father contends the juvenile court erred in denying his request that Myla be placed with him pursuant to Welfare and Institutions Code section 361.2.[1] We affirm.

## FACTUAL AND PROCEDURAL HISTORIES

Eight-year-old Myla came to the attention of the Fresno County Department of Social Services (Department) on July 29, 2011, when her mother, Jennifer P. (mother), was arrested for felony child abuse for biting Myla's half-brother, T.T., on his arm. A protective hold was not placed on T., as he was placed with his paternal grandparents until his father, who lived in Minnesota, was able to travel to Fresno and pick him up. The same plan could not be made for Myla, so a protective hold was placed on her and she was put into foster care.

Mother named K.P. as Myla's father, and said he lived in Minnesota. She could not remember his telephone number, but had a contact number for him in her cellular phone. The social worker asked mother what type of relationship Myla had with father; mother responded that Myla did not care to visit him because he worked a lot and drank daily when Myla was around him. The Department had been unable to locate him. Mother admitted to the social worker that there was domestic violence in her home, where she lived with her boyfriend and the children, she had used methamphetamine on and off for the past six years, and she used her hand, sandal or belt to spank the children. Mother said she stopped using methamphetamine on her own for two years when she was

_____

[1] All statutory references are to the Welfare and Institutions Code.

2.

living in Minnesota. She started using again when she returned to Fresno and started seeing her boyfriend.

The Department filed a dependency petition on August 2, 2011. At the September 26, 2011 jurisdictional hearing, the juvenile court found true allegations in a second amended petition that Myla came within the provisions of section 300, subdivisions (a) and (b), based on mother having bitten T. on the arm while under the influence of methamphetamine, her admitted use of corporal punishment, and her history of substance abuse that negatively affected her ability to provide for and protect Myla.

The dispositional hearing was held on December 7, 2011. In a report prepared for the hearing, the Department recommended that mother receive reunification services and that father be denied services pursuant to section 361.2. The social worker explained the efforts made to locate father. A parent search was initiated on August 4, 2011, but his whereabouts remained unknown to the Department. On November 16, 2011, mother told the social worker she had a telephone number for father, and while she did not have it with her, she promised to give it to the Department. On November 30, 2011, mother provided the telephone number, and the Department was in the process of arranging a Lao-speaking social worker to contact father to obtain his mailing address. The Department considered father to be Myla's presumed father, as his name is on her birth certificate, mother and he were married at the time of Myla's birth, and father held Myla out as his own child and was involved in caring for her when she was young. Myla reported she knew her "real dad" while living in Minnesota. Father had no criminal history.

The social worker noted in the report that Myla and mother have a positive relationship, and they wanted very much to reunify. Mother recognized the damage substance abuse had caused her family, as well as the harm caused by her involvement in relationships which included domestic violence. Mother was doing well in her substance abuse treatment, and received support from the maternal grandmother, who had been

3.

cleared to supervise weekly visits between Myla and mother. Myla had begun to act out recently, but mother claimed she rarely had problems with Myla's behavior in the past. The social worker stated that Myla was able to express herself well and had talked to him about her anxiety regarding separation from her mother. Myla had supervised visits with mother; the visits were going well.

The social worker met with Myla's third grade teacher. Myla was receiving intervention due to her status as an English language learner; her performance was consistent with her tested level of English acquisition, which was "early intermediate." Myla received pull-out instruction to strengthen her ability to read, write and speak English. While the teacher had noted on Myla's report card that she "disturbs class," the teacher told the social worker Myla was no more unruly in class than many other students.

The juvenile court previously had granted the Department's request for a mental health assessment of Myla, as she was stealing items from other children in the foster home, lying, talking back to her care provider, and wetting the bed. The therapist who assessed Myla recommended individual therapy for her due to her "symptoms of worry and sadness that likely fuels her behavioral issues related to her recent separation from her mother." Myla continued to exhibit inappropriate behaviors, which had gotten more destructive, as she sometimes kicked the door when angry and intentionally broke her eyeglasses.

In completing her domestic violence inventory on October 13, 2011, mother identified her relationship with father as one that involved physical abuse. While the two were still married, they had been separated at least seven years. At a psychological evaluation that took place on November 12, 2011, mother reported that she and her boyfriend had been in a relationship "on and off" for two years. She moved out-of-state to "get away from him"; she was living in Minnesota, and doing well for herself and her

children, but then got back in touch with the boyfriend and returned to California in March 2011.

At the December 7, 2011 hearing, the Department provided a declaration of due diligence to the juvenile court. After reviewing the declaration, the court found the Department had exercised due diligence in attempting to locate father. The social worker confirmed that father's first name was misspelled in the petition and other documents in the case, and asked that the name be corrected on the minute orders. The juvenile court confirmed that the Department did search for father using both the incorrect and correct spellings of his name. The juvenile court found Myla was a person described under section 300, subdivisions (a) and (b), made her a dependent, removed her from mother's custody, ordered supervised visits between mother and Myla, denied father services pursuant to section 361.2, subdivision (a), and ordered mother to participate in services.

A hearing was held on March 14, 2012[2] to address the Department's request to remove the authorization for third party supervised visits, as the maternal grandmother who had been supervising mother's visits had stopped providing narratives of visits and the Department could not reach her, and mother had relapsed on methamphetamine. Instead of removing the authorization for third party supervised visits entirely, the juvenile court withdrew the maternal grandmother as an approved third-party supervisor. The Department's court officer then informed the court that father had been located in Bloomington, Minnesota, where he lived, and that he requested counsel. The Department was assessing him for placement and still was in the process of determining whether placement would be detrimental. At the court officer's request, the juvenile court appointed counsel for father.

In a report prepared for the June 4 review hearing, the Department recommended that mother's reunification services continue. The social worker noted that mother lacked

---

[2] Subsequent undesignated references to dates are to dates in 2012.

5.

stable housing and was living with friends; she had shown minimal participation in court-ordered services. Mother had relapsed on methamphetamine despite having been referred to several in- and out-patient treatment programs. While mother needed mental health services, she was discharged from therapy for nonattendance. She was re-referred to a program for child abuse batterer's treatment after being discharged for excessive absences, but did not attend the intake.

Father had requested that Myla be returned to his care. Myla was living in the same foster home. There were ongoing concerns regarding her behavior in the home and at school. Myla's grades for work habits and social skills were consistently poor or unsatisfactory; her teacher noted on her report card that her efforts needed to improve and she disturbed the class. A student attendance summary from her school listed her language as "LAO."

Myla was participating in weekly therapy sessions to assist her in reducing her difficulties with following directives, excessive anger, arguing, lying and stealing; she also was receiving Therapeutic Behavioral Services (TBS) to address these concerns. Her behavior worsened shortly after the social worker began speaking with her about the possibility of living with father in Minnesota. Myla's therapist reported that Myla's symptoms appeared to be exacerbated by her inconsistent visits with mother, as well as her worries regarding potential reunification with father. TBS was going to be terminated, as there had not been significant progress with the most serious behaviors.

After the juvenile court ordered that the maternal grandmother could no longer supervise visits, the Department submitted a referral for visitation. Visits were to begin on March 26, but mother failed to attend. She attended a visit on April 2 and saw Myla briefly on April 8, but did not attend visits after that date. The social worker tried to reach mother, and finally did so on May 8; mother wanted to resume visits. The Department instituted another referral, but was informed on May 23 that mother needed to drug test before each visit pending her participation in substance abuse treatment. This

required a modification of the visitation referral; as of the writing of the report, visitation still was being scheduled. Myla wanted to visit her mother and did not wish to live with father.

The social worker noted that while father wanted Myla returned to his care, shortly after being informed of that possibility, Myla began displaying more extreme behavioral problems, and the care provider reported she would cry at night and insist she did not want to live with father. The social worker opined it would be detrimental to Myla's psychological well-being to be reunified with father, but placement with him could become appropriate as her behavior stabilized and she was able to process in therapy the idea of living with father.

At the June 4 review hearing, the juvenile court granted the request of the attorneys for father and mother for a continuance so they could review the report with their clients. At the continued hearing on June 15, the Department submitted on the social worker's report. Myla's attorney asked the Department to assess and facilitate telephone contact or Skype visitation with father, as Myla was interested in getting to know father. Father's attorney stated her office had spoken with father; she asked for a continuance, as they had not received the entire discovery previously ordered. Father's attorney understood that the Department was to assess father for "361.2 placement," but she did not see any assessment addressed in the report and without narratives that had not been provided, she did not know if the Department had contacted him. She further explained that father is Laotian and it is very difficult to communicate with him; she had a limited conversation with him and needed a Laotian interpreter to help her further assess and discuss the case with him. Mother's attorney submitted on the continuance request and the report. The juvenile court granted the request for continuance, and gave the Department discretion to assess for reasonable supervised telephone and Skype contact between father and Myla.

7.

On June 27, father filed a section 388 petition requesting reunification services. Father noted that at disposition, the juvenile court erroneously denied him services under section 361.2, when it should have denied them under section 361.5, subdivision (b)(1),[3] as his whereabouts were unknown. Father asked the juvenile court to modify the order and to order the Department to provide services as required by section 361.5, subdivision (d).[4] The juvenile court granted father's request to have the petition heard at the continued review hearing set for July 2.

At the July 2 hearing, the Department requested a continuance to address the services father requested. After an off-the-record discussion, the juvenile court directed the Department to assess father for placement. The court noted the social worker's report had some analysis on that issue, but more information may be useful to assist the court in its decision. The court also ordered the Department to assess father for services and continued the hearing.

On July 31, the juvenile court granted the Department's request for Myla to begin taking psychotropic medications to address her symptoms of inattention and hyperactivity, as well as her intrusive, fidgety and aggressive behaviors. Myla had been diagnosed with ADHD, disruptive behavior disorder NOS, and physical abuse of a child.

In an addendum report, the Department recommended the juvenile court grant the section 388 petition and order reunification services for father. It further recommended father complete mental health and substance abuse assessments, and any recommended

---

[3] Section 361.5, subdivision (b)(1) provides that reunification services need not be provided to a parent whose whereabouts are unknown, and the finding must be supported by proof that a reasonably diligent search has failed to locate the parent.

[4] Section 361.5, subdivision (d) provides that a parent who is denied services under section 361.5, subdivision (b)(1) must be provided reunification services if the parent's whereabouts become known within six months of the child's out-of-home placement.

treatment. The social worker reported that Myla had consistently stated she did not wish to live with father. When the social worker spoke with Myla on January 31 regarding her relationship with father, Myla stated she did not remember anything about the times she lived with father, but she sometimes spoke with him over the phone during visits with mother. When asked whether she wanted to live with father, Myla said she did not want to because she would miss mother, who would be sad. The social worker told Myla father was asking about her because he loved her a lot and wanted her to live with him. Myla continued to state she did not want to live with him. After that conversation, Myla's behavior at home and school became markedly more disruptive. Myla's care provider reported Myla was more easily upset and tearful, and would sometimes come to her at night crying and saying she did not want to live with father.

On March 8, the Department received a referral alleging Myla had been sexually abused by an unknown male adult while in father's care. The outcome of the referral was pending. That same day, the social worker spoke with Myla regarding her experiences while living with father. Myla said she did not like living with him because he would become drunk while she played at a friend's house, and when she returned home there would be "bottles and cans" on the table and father would act "a little crazy." Myla described father as having red eyes and swaying.

On March 15, an investigator with Fresno Child Advocates contacted Myla's foster care provider to see if she had concerns regarding Myla and father. The care provider stated that on March 7, Myla told her she did not wish to live with father because she was almost raped by one of father's friends. Myla said that while she was lying on a bed at father's home, one of his friends laid on top of her. Myla said she began to yell; some of Myla's friends came into the room and pushed father's friend off of her. Myla did not say whether father was present at the time of the incident, whether she told him about it, or when the incident occurred; she only said it occurred during a period of time she lived with father. The care provider, who reported the incident to the social

9.

worker, was concerned about Myla's safety, as Myla recently had begun having nightmares and told her "Mommy, I don't want to go."

The social worker spoke again with Myla about her family on June 27. When asked about father, Myla said she wanted to speak with father over the phone. The social worker asked how she would feel about visiting father if he came to Fresno to see her; Myla stated she would only want to see him if it was supervised by someone she knew.

On July 27, the social worker asked Myla if she had spoken with father on the phone. Myla said she had not and she did not know his number. The social worker promised to provide her with the number the following Monday, July 30. The care provider, however, told the social worker that she had the phone number and frequently suggested Myla call father, but Myla never wished to do so. On July 31, the Department received a referral alleging that father had physically abused Myla. The outcome of the referral was pending.

The social worker made several telephone calls to agencies in Minnesota to assess what reunification services were available, especially ones in Lao, father's native language. While the social worker could not locate a parenting class taught in Lao, mental health services were available in Lao, which could refer father to substance abuse treatment agencies that were linguistically appropriate.

The social worker opined that placement of Myla with father would be detrimental, as Myla's mental health symptoms worsened when she was informed she may be placed with father, she had expressed very emotionally her fear of living with father, she was resisting telephone contact with him, and there was an open referral alleging physical abuse.

At the August 6 hearing, the Department reiterated its recommendation that the juvenile court grant the section 388 petition, order father to complete mental health and substance abuse assessments and any recommended treatment, provide father with unsupervised telephone contact with Myla, and give the Department discretion to move

10.

to unsupervised visits should father travel to Fresno County. Myla's attorney opposed the recommendation for unsupervised visits, and asked that they be supervised, but otherwise submitted on the Department's request.

Father's attorney agreed with the provision of reunification services should the court find detriment to return Myla to father, but did not believe there was sufficient evidence in the two reports to warrant a detriment finding, so he was objecting to the court finding "by the preponderance of the evidence" that there was current detriment to returning Myla to father. The court stated it believed father was both setting for contest and orally arguing that it could not adopt the Department's recommendations because there was "not sufficient detriment under 361.2 analysis to interfere with placement." The court was not sure the case was "in that procedural status[,]" and asked father's attorney whether his position was that father was "good with services but we don't think we can get services so I'm challenging the whole underlying basis. . . . There shouldn't have to be services because there's no risk of detriment to return, right?" Father's attorney responded that was "a necessary finding at the six-month review," and he was "jumping ahead" to the six-month review findings.

Father's attorney did not want to set the matter for contest and did not think he needed to, as "[t]here's no additional information the Court needs to make the decisions it has to make. I'm just objecting to the --" The court then stated, "Six-month RDS finding sufficient detriment to return." Father's attorney responded, "Yes." Father's attorney then argued that the Department had father's contact information since November 2011 and the only evidence of detriment was Myla stating on a number of occasions that she did not want to return to father. The court responded that it always had to consider the child's best interests, and even if father was the "most appropriate and wonderful gentlemen in the world," if the child is "significantly damaged and has understandable fears there may be sufficient detriment to return from the child's perspective." Father's attorney responded Myla's concerns alone were insufficient evidence of detriment and

11.

could be addressed by family maintenance services, and there was not enough showing of continuing detriment.

Mother's attorney submitted on the record and further argued the court could find detriment to return Myla to father based on her psychological deterioration since being advised father wanted her to live with him. She did not think Myla spoke father's primary language and she did not believe Myla spoke any language except English, so placing her in the home of an unknown father out-of-state was sufficient evidence from which the court could find detriment.

County counsel argued the two reports contain clear and convincing evidence that it would be detrimental to place Myla with father in Minnesota in light of the facts that clearly existed. County counsel asked the court to "make a clear and convincing evidence finding that it would be detrimental to place this child with the father who is requesting placement at this time," as that issue had never been dealt with before. The juvenile court noted father was technically a non-offending, non-custodial parent. County counsel explained the Department was recommending reunification services for father under section 361.2, and the court had to decide whether there was detriment to place Myla with father at that time.

The juvenile court issued its rulings. The court ordered that the December 7, 2011, minute order be corrected to state that reunification services were denied to father under section 361.5, subdivision (b)(1), not 361.2. The court found mother was provided reasonable reunification services. The court granted father's section 388 petition to the extent of providing reunification services to him. The court found father to be a non-offending, non-custodial parent, but also found it would be detrimental to Myla to place her with father, explaining that "[d]etriment must be seen in a mirror or from both sides. The father's side is reflection in the mirror, if you will, by that analogy his daughter's consideration. I don't think he can be universally considered in a vacuum as to whether father presented any particular identified risk of detriment. In this instance there is

12.

sufficient detriment by clear and convincing evidence very easily found by the Court to return this child to the father at this juncture."

The court cited the following reasons for its detriment finding: (1) father had not been substantially involved in Myla's life for quite some time and did not take on proper monitoring and parental roles, especially during times of crisis while in mother's care; (2) when he did appear in this case, it was well after the jurisdictional hearing, which was evidence of a lack of interest or responsibility, and a lack of emotional connection to Myla; (3) Myla is primarily English speaking, while father is not; (4) Myla had been in an unstable situation which emotionally damaged her, and it would be detrimental to disrupt her current placement by sending her to another state when the Department was unaware of her situation, the child was of "tender years," and father had not been fully evaluated for services; (5) Myla did not desire to reunify with father, which the court recognized was not a paramount concern but was still significant, and she had a subjective fear of him, which the court recognized may not be grounded in fact, but which could lead to tremendous damage if she were forced to return to him; (6) there was an allegation that Myla was sexually abused by an unknown male adult while in father's care, which was completely unproven and possibly quite old, but was in the report and provided additional evidence of detriment; (7) Myla had memories of father being inappropriate while she was in his care due to alcohol intoxication which, whether true or not, were memories and provided additional evidence of detriment; and (8) shortly after Myla was informed of the possibility of returning to father's care, she began to act out. Based on these facts, the court found significant and substantial risk of detriment to return Myla to father at the six-month phase without his having engaged in services and being involved in Myla's life.

The court found mother had made minimal to moderate progress on her services, return to the parents would create a substantial risk of detriment, Myla would remain a dependent, and reunification services would continue for mother and be provided to

13.

father. Father's plan included a substance abuse assessment and any recommended treatment, random drug testing up to four times until the issue was revisited, and a mental health assessment and any recommended treatment. Father also was given reasonable visitation with Myla supervised by the Department, an approved agency, or third person should he come to Fresno, and supervised contact by letter, telephone and all other reasonable electronic means available, with the Department given discretion to move to unsupervised.

**<u>DISCUSSION</u>**

Father contends the juvenile court erred when it denied him placement of Myla under section 361.2. Father claims that (1) while placing Myla with him may have upset her because she wanted to be with mother, she was not entitled to decide where she was placed, (2) Myla's mental health issues were not substantial evidence that he was unable to meet her needs, (3) the absence of information about him was not substantial evidence of detriment, and (4) the juvenile court erred in assuming he and Myla were unable to communicate, as the evidence showed they both speak Lao.

When a nonoffending, noncustodial parent requests custody of a minor who has been removed from the home, "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) If no detriment exists, the court orders placement of the child with that parent. (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1132.) A detriment evaluation requires the court to weigh all relevant factors to determine if the child will suffer harm. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425 (*Luke M.*).) A detriment finding is properly supported by emotional harm even in the absence of the noncustodial parent's contribution to detriment. (*Ibid.* [emotional harm caused by loss of sibling relationships].) Because "detriment" has no clear-cut meaning, courts making placement decisions must have the

14.

ability to be flexible based on facts unique to each child and parent. (See *Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51, 66.)

"'We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that the children would suffer such detriment. [Citations.] Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.'" (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569–1570 (*John M.*).) We may not, however, reweigh or express an independent judgment on the evidence. (*In re Laura F.* (1983) 33 Cal.3d 826, 833 (*Laura F.*).) In determining the sufficiency of the evidence, we give full effect to the respondent's evidence, even if it is slight, and disregard the appellant's evidence, regardless of its strength. (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 881.) Issues of fact and credibility are for the trial court alone. (*In re Amy M.* (1991) 232 Cal.App.3d 849, 859–860.)

We agree with father that some of the bases for the juvenile court's detriment finding are not supported by the evidence or involved impermissible inferences. For example, there is no evidence that Myla did not speak Lao; in fact, the evidence shows school records identified Lao as her language and that she was an English language learner. In addition, while there was no evidence concerning father's relationship with Myla or whether he had contact with her after she came back to California with mother in March 2011, the lack of such evidence, without more, does not support the findings the juvenile court made that father had not been substantially involved in Myla's life, did not properly monitor her or take on parental roles, and lacked interest, responsibility and an emotional connection with her. This is because the record does not affirmatively show that father was not in contact with Myla or, if he did not contact her, why he did not do so. There is also no evidence that father knew of Myla's circumstances while living with mother in California, yet failed to intervene, or whether he had any way to discover that

15.

Myla was the subject of dependency proceedings. It cannot be reasonably inferred from the dearth of information regarding father's contacts that he did not contact, or attempt to contact Myla, or that any lack of contact reflected something about father that tends to show it would be detrimental to place Myla in his custody. As it was the Department's burden to prove detriment, any lack of information here has to be held against the Department. (See, e.g., *In re Z.K.* (2011) 201 Cal.App.4th 51, 67.)

If those were the only grounds for finding detriment, we might agree with father that the juvenile court erred. There is other evidence, however, to support the detriment finding, namely Myla's emotional distress at the thought of being placed in father's custody and her claims of physical abuse by father, an attempted sexual assault by a friend of his, and father's drinking. Father contends this evidence is insufficient because Myla is not credible, her bad behaviors were attributable to mother's conduct and Myla's separation from her, and there is no evidence to show father actually engaged in the conduct of which Myla complained. In essence, father is claiming that the juvenile court should have found that Myla simply did not want to live with father and would do, or say, anything to prevent that from happening, including being dishonest about her life with father.

While the juvenile court certainly could have made these findings, it did not. Instead, the juvenile court found that Myla had real fears about living with father, which manifested themselves in her worsening behaviors after learning she might be placed with him, and were based on her memories of living with father, including his drinking and physical abuse, as well as the alleged sexual assault. These findings are supported by the record in this case, and in turn, support the ultimate finding of detriment to place Myla with father, as Myla's behaviors could worsen while in his custody. Although Myla at first did not remember anything about the times she lived with father, either her memories later returned or she became more comfortable with revealing things about father to her care provider and social worker as the case progressed. The emotional harm

16.

Myla experienced as a direct result of the idea of living with father was amply supported by the care provider's reports of her behavior, her therapist's report which stated Myla's symptoms were exacerbated by her worrying about reunifying with father, and the opinion of the social worker, who was familiar with her and the case.

Father correctly points out that there is no evidence he was unable to provide Myla with adequate care, as the Department never assessed him or his home, or that the events Myla relayed to her care provider and social worker actually occurred. It is clear from the case of *Luke M.*, however, that a detriment finding properly can be supported by emotional harm even when the noncustodial parent did not contribute to the detriment. (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1425.) Here, even if father did nothing to contribute to Myla's fear of him, the juvenile court reasonably could conclude that Myla did fear him, that her fear was real, and that it manifested itself in destructive behaviors that, if she were placed with father, would continue or worsen.

These facts distinguish this case from the one father relies on, *John M.*, *supra*, 141 Cal.App.4th 1564. In *John M.,* the juvenile court found detriment based on the 13–year–old child's stated wish not to live with his father, the child's relationship with his infant sister and members of his extended family, the child's lack of a relationship with his father, "the paucity of information" about his father, and the mother's reunification plan. (*Id.* at p. 1570.) The Court of Appeal concluded these factors were insufficient to support a finding of detriment. (*Ibid.*) In so holding, the appellate court found the child's wishes were not clear and, in any event, should not be the deciding factor. (*Ibid.*) The court also found there was little to no evidence the child had a particularly close relationship with his 10–month–old sister and, even so, father would facilitate visitation between them. (*Ibid.*) The court noted that while father had been out of contact with the child for four years, he was not to blame for the separation and he resumed contact one year before the dependency petition was filed. (*John M., supra,* at p. 1571.)

17.

Here, while Myla consistently expressed that she did not want to live with father, unlike the case of *John M.*, there was also evidence that her emotional well-being was adversely affected by the thought of living with him, as her memories of him were of abuse and neglect. Father's contentions are little more than a request for us to reweigh the evidence and reach a different conclusion. That we may not do. We can decide only whether sufficient evidence supports the juvenile court's finding. (*Laura F.*, *supra*, 33 Cal.3d at p. 833.) On this record, we conclude there is sufficient evidence to support the court's finding of detriment.

## DISPOSITION

The juvenile court's order denying father placement of Myla is affirmed.